IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
ALBANY DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| Plaintiff, | : | |
| v. | : | Case No. 1:14-CR-9 (WLS) |
| | : | |
| WILLIAM C. HARRIS, | : | |
| | : | |
| Defendant. | : | |
| | : | |

**ORDER**

Presently before the Court is Defendant William C. Harris' Motion to Suppress. (Doc. 23.) For the following reasons, Harris' Motion to Suppress is **GRANTED-in-PART** and **DENIED-in-PART**.

**PROCEDURAL BACKGROUND**

On March 11, 2014, Defendant was indicted for possession of a firearm by a convicted felon in violation of 18 U.S.C. § § 922(g)(1) and 924(a)(2). (Doc. 1.) On July 15, 2014, Defendant filed the instant Motion to Suppress and argued the warrantless search of his residence on April 9, 2012 lacked reasonable suspicion and as a result, the evidence seized should be suppressed. (Doc. 23.) Defendant further contends custodial statements obtained that same day violated the Fifth Amendment by undermining procedural safeguards established in *Miranda v. Arizona*, 384 U.S. 436 (1966), and should be suppressed. (*Id.*) On October 22, 2014, the Court held a hearing to address the arguments and factual matters underlying this Motion. (*See* Doc. 31.)

1

## FACTUAL FINDINGS

During the Court's October 22, 2014 hearing on Defendant's Motion to Suppress, the Government presented four exhibits[1] and two witnesses. Defendant presented two exhibits and no witnesses. After reviewing the proffered exhibits, witnesses' testimony, and Parties' arguments, the Court makes the following findings of fact by a preponderance of the evidence.

Georgia Bureau of Investigation ("GBI") Agent Stripling Luke, a testifying witness for the Government, and other agents of GBI were contacted by an employee of the United States Postal Service (USPS) regarding delivery of a hydroponic light, often used for the growth of marijuana, on or prior to April 9, 2012. Agent Luke discovered the delivery address for the hydroponic light was Defendant's residence. Further investigation revealed that Defendant was previously an inmate at Crisp County, Georgia jail and had past drug violation charges. After reviewing Defendant's criminal history and discussing his criminal background with the District Attorney's Office in Cordele, Georgia, Agent Luke learned the terms of Defendant's probation. According to Defendant's probation conditions, his "person, residence, or motor vehicle" could be searched at the request of his probation supervisor or by a law enforcement officer "for detection of alcohol or controlled substance" without a warrant. (*See* Doc. 23-1.) Defendant's probation officer, Jemel Washington, confirmed the terms of Defendant's probation, and agreed to observe the delivery of the hydroponic light and another package containing a liquid substance with Agent Luke. On April 9, 2012, after observing Defendant's receipt of delivery, both Officer Washington and Agent Luke approached Defendant in his driveway.

Agent Luke and Officer Washington engaged in a conversation with Defendant about the hydroponic light delivered that day. Agent Luke asked Defendant what the hydroponic light was intended for. Defendant replied that the light would be used for his stepmother's greenhouse. In response, Agent Luke asked if he could view the greenhouse. Defendant consented. Agent Luke was joined by several law enforcement officers. As the

---

[1] For the Record, Government's Exhibit 4, accepted without objection by Defendant by and through counsel, includes two folders which contain an audio recording played during the Court's hearing on October 22, 2014. Exhibit 4 is a recording of events from the search of Defendant's residence on April 9, 2012. Agent Luke testified that during the search of Defendant's residence the recording device was turned off briefly.

2

search commenced, when asked whether there was anything on the property law enforcement should know about, Defendant acknowledged possession of one marijuana plant. Defendant insisted there were no firearms on the property except for those in his father's gun safe. Agent Luke testified that sometime after Defendant's representation that no firearms were on the premises except for those in his father's gun safe, a revolver handgun was found in a desk drawer where Defendant resided. (Doc. 31-1 at 1-2.) As the search proceeded, Defendant continued speaking with several officers. Defendant, during his conversation with GBI Agent Nikki Rhodes, was told growing a marijuana plant was a violation of Defendant's probation. After over nineteen minutes speaking with law enforcement officers, Defendant received his *Miranda* warning.

Defendant continued to chat with law enforcement officers thereafter about various topics, including the production of marijuana. During his conversation with Agent Luke, Defendant said "all of the things I'm telling you are probably going to hurt me," and Agent Reed responded "yeah, they probably will." Agent Luke went on to say "you don't have to talk to me." After Agent Luke reiterated Defendant did not have to confer with him, Defendant declared he would speak to Agent Luke "off the record" about marijuana production. Agent Luke responded "sure", and when asked again by Defendant for confirmation their conversation was "off the record", Agent Luke stated "okay, off the record." During the Court's hearing, Agent Luke testified that there's "no such thing as off the record" and that in his opinion, it is okay to lie when interrogating individuals in custody. Defendant did not receive his *Miranda* warnings again after agreeing to speak further with Agent Luke "off the record."

After the revolver handgun and marijuana plant were seized and Defendant was informed his conversation with Agent Luke was "off the record", Bureau of Alcohol, Tobacco, and Firearms and Explosives ("ATF") Agent Jeff Reed arrived. Upon his arrival, Agent Rhodes informed him about the preceding search leading to seizure of both a hand gun and marijuana plant. Agent Reed was also told Defendant had received his *Miranda* rights. Agent Reed testified he was unaware of Agent Luke's suggestion his conversation with Defendant was "off the record." Agent Reed also testified his conversation with Defendant persisted for some time on various topics including the gun safe on the

premises.[2] During that conversation, Agent Reed asked Defendant to enter the gun safe's passcode to search its contents. Agent Reed testified that given the size of the gun safe, he suspected drugs could be warehoused in the gun safe in addition to firearms. Defendant initially denied knowing the passcode for the gun safe until Agent Reed advised that Defendant either give him the gun safe code or he'd force it open. Defendant, after Agent Reed's avowal to open the gun safe with or without the passcode, complied with Agent Reed's request, opened the gun safe, and then provided the passcode. Law enforcement officers found twelve firearms in the gun safe. (Doc. 1; Doc. 28 at 2.) Subsequent to the seizure of firearms within the gun safe, Agent Reed testified that Defendant admitted to discharging a firearm a month prior and his girlfriend purchasing ammunition since he was a convicted felon and could not be in possession of a firearm. On March 11, 2014, Defendant was indicted for one count of Possession of a Firearm by a Convicted Felon. (Doc. 1.)

## DISCUSSION

Defendant argues both his custodial statements and the evidence obtained during search of his residence on April 9, 2012 should be suppressed. (Docs. 23, 27.) The Court will consider both of Defendant's arguments in turn.

### A. Suppression of Defendant's Custodial Statements

Defendant contends all statements he made *after* being advised by Agent Luke they were "off the record", including his conversation with Agent Reed, should be suppressed. (Doc. 27 at 12) (*emphasis added*.) In essence, Defendant argues Agent Luke's "off the record" statement contradicted his prior *Miranda* warning and caused him to conclude all custodial statements made thereafter would not be detrimental to him. As a result, Defendant contends all custodial statements made after Agent Luke's misrepresentations were involuntary and should be suppressed.

Generally speaking, *Miranda* warnings should precede any "custodial interrogation." *See Miranda*, 384 U.S. at 444. A Defendant is in custody when there is a formal arrest or a restraint of movement of the degree associated with formal arrest. *United States v. Brown*, 441 F.3d 1330, 1347 (11th Cir. 2006). When a party in custody is informed of his *Miranda* rights,

---

[2] For the Record, Agent Reed suggests part of his conversation with Mr. Harris is not recorded by Government's Exhibit 4. (Doc. 31-1 at 4.)

4

he can waive these rights if the waiver is voluntarily, knowingly, and intelligently given. *Moran v. Burbine*, 475 U.S. 412, 421 (1986).  Courts rely on a two-part test outlined by the U.S. Supreme Court to determine whether a waiver of *Miranda* rights is voluntarily, knowingly, and intelligently given:

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception.  Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.  *Only if* the "totality of the circumstances surrounding the interrogation" reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the Miranda rights have been waived.

*Id.* (*emphasis added*).

All statements made by Defendant after Agent Luke's acknowledgement and agreement their conversation was "off the record", were made involuntarily.[3]  Contrary to the Government's assertion, and Agent Luke's belief, intentionally false representations directly contradicting a *Miranda* warning are never appropriate.  *Miranda* warnings are intended to create an inflexible protection for individual's Fifth Amendment rights.  *Miranda,* 384 U.S. at 474.  Once an individual receives his *Miranda* rights, statements made thereafter by law enforcement in connection therewith which are clearly incompatible with the intent of *Miranda* and its progeny will be considered involuntary.  *See Hart v. Attorney General of State of Florida*, 323 F.3d 884, 894 (Finding law enforcement's suggestion to a Defendant that "honesty wouldn't hurt" in contradiction to "the *Miranda warning* that anything [Defendant] said could be used against him in court.").  According to Agent Luke's own testimony, Defendant expressed fear he'd incriminate himself by making statements and requested assurances he would not be harmed in his conversation with Agent Luke.  Rather than

---

[3] While neither party disputed either in their briefs or during the hearing on the present Motion that Defendant was in custody, the Court notes its factual finding that Defendant was in custody or at a minimum restrained when being interrogated by Agent Luke following Defendant's *Miranda* warning.  The fact that Agent Rhodes provided Defendant with his *Miranda* rights evinces agent's belief that Defendant was in custody.  In the view of the Court, a reasonable man, in the position of Defendant, a person then on probation, would feel restrained in his freedom of movement during the search of his residence, and as a result was in custody. *United States v. McDowell*, 250 F.3d 1354, 1362 (11th Cir. 2001).

5

reiterating to Defendant his statements could and would be used against him, Agent Luke made the deliberate decision to adopt Defendant's erroneous belief and agree they were speaking "off the record", something he testified did not exist. As a result, it is without question all statements made to Agent Luke thereafter, without more, must be suppressed after Agent Luke's "off the record" statement.

Defendant's custodial statements to Agent Reed and other officers after Agent Luke's admitted representation, even though he thought it permissible, must be suppressed as well. In deciding whether involuntary statements taint subsequent statements made to law enforcement, the Court refers to *Missouri v. Seibert* for guidance,[4] considering Agent Luke acknowledges his "off the record" comment, an untruth, was a tactic to elicit custodial statements from Defendant. 542 U.S. 600 (2004). In *Seibert,* the Supreme Court held where law enforcement proceeds with interrogation techniques intended to undermine *Miranda,* successive custodial statements should be suppressed unless curative steps are taken by law enforcement to correct a prior violation. *Id.* at 621-22. No evidence of any curative steps exists in the Record.

Defendant's interrogation by Agent Reed only an hour or few hours later, predominately dealt with the same general topics as his interrogation by Agent Luke. No evidence suggests that after Agent Luke's "off the record" comment, Defendant was told the significance or effect of either a *Miranda* warning or *Miranda* waiver by Agent Reed or any other law enforcement officer. Instead, Agent Reed continued the previously ongoing interrogation of Defendant under the assumption Defendant received his *Miranda* rights and had intelligently, knowingly, and voluntarily waived them. Agent Reed's assumption, however well intentioned, is irrelevant considering Defendant was intentionally told his statements were "off the record" when it was untrue and in direct contradiction to his *Miranda* rights. *Moran*, 475 U.S. at 423 ("whether intentional or inadvertent, the state of mind of the police is irrelevant to the question of the intelligence and voluntariness of respondent's election to abandon his rights.").

---

[4] The Court relies on *Missouri* in as much as this case also addresses an instance where tactical strategies were taken by law enforcement officers to elicit involuntary statements. The Court finds that the statements made by Defendant after Agent Luke's misrepresentation are involuntary. As a consequence, similar to *Missouri* the Court finds statements made thereafter to officers, working with Agent Luke, are "fruits" of Agent Luke's misrepresentation undermining Defendant's Fifth Amendment right.

6

In the view of the Court, absent Agent Luke's "off the record" misrepresentation, Defendant's custodial statements would be non-existent or relatively scarce. Coercion is often inherent in custodial interrogation thus blurring the line between voluntary and involuntary interrogation. *Dickerson v. United States*, 530 U.S. 428, 435 (2000). Recognizing this, *Miranda* and its progeny established concrete guidelines both law enforcement and courts are expected to follow. *Id.* By making a misrepresentation to Defendant, whether he thought doing so was proper or not, Agent Luke effaced longstanding principles established by *Miranda*.[5] Accordingly, all statements made by Defendant after Agent Luke's "off the record" statement are suppressed.

### B. Physical Evidence Found at Defendant's Residence

Defendant further contends all physical evidence, including firearms found in the gun safe, should be suppressed since law enforcement lacked the requisite reasonable suspicion to search Defendant's home. (Doc. 25, 27.) Law enforcement can search the residence of a person on probation without a warrant with reasonable suspicion. *United States v. Knights*, 534 U.S. 112, 119 (2001). Here, Defendant's terms of probation required reasonable suspicion. Reasonable suspicion exists where there's a high probability of criminal conduct such that an intrusion into an individual's privacy interest is merited. *Id.* at 121. Courts making a determination on whether an officer had reasonable suspicion are to evaluate the totality of the circumstances to see if a particularized and objective basis for suspecting legal wrongdoing existed. *United States v. Yuknavich*, 419 F.3d 1302, 1311 (11th Cir. 2005.) Law enforcement must be able to point to specific and articulable facts and cannot rely upon bare suspicion or a hunch to show reasonable suspicion. *Id.*

In this case, law enforcement officers' search of Defendant's residence commenced only after reasonable suspicion existed. According to the testimony of Agent Luke, without prompting, a postal service employee contacted GBI regarding the delivery of a hydroponic light. After the unsolicited tip from that employee, GBI investigated Defendant's criminal

---

[5] The Court finds the facts and circumstances here are clearly distinguishable from false statements or assertions employed by law enforcement officers tactically interrogating a defendant who is giving a voluntary statement following an intelligent, knowing, and voluntary waiver of his Fifth Amendment rights. Here, the misrepresentation was directly connected to the *Miranda* warning. Defendant did not clearly waive his rights and then voluntarily make statements. He agreed only to make statements "off the record" as agreed to by the agent.

7

background and learned of the terms of his probation and his several drug charges, including possession of marijuana with the intent to distribute. Rather than conducting a search on this information alone, in accordance with Defendant's probation and to ensure Defendant was the recipient of the hydroponic light, law enforcement coordinated a stake out with Defendant's probation officer. Law enforcement did not immediately conduct a search of Defendant's residence without a warrant, as authorized by the terms of his probation, until witnessing his receipt of the packaged hydroponic light. Considering the evidence obtained from law enforcement's substantive investigation and observations, the Court finds there was reasonable suspicion of illegal conduct justifying a search of Defendant's residence. Furthermore, as a matter of law, persons on probation reasonably suspected of engagement in criminal activities are not afforded the same privacy considerations as persons not on probation prior to a search. *Knights*, 534 U.S. at 121. Per the express terms of Defendant's probation and evidence relied upon, there was a sufficient basis to search Defendant's residence. This evidence included Defendant's acknowledgement and production of a marijuana plant.

Defendant also contends the officers exceeded the scope of their search when they entered the gun safe at Defendant's residence since, according to Defendant, there was no reason to suspect alcohol or controlled substances were contained therein.[6] (Doc. 27 at 10.) In response, the Government argues the officers had a reasonable suspicion drugs could be contained in the gun safe. The officers were permitted to search for the "detection of alcohol or controlled substances" without a warrant per the terms of Defendant's probation. (Doc. 23-1 at 2.) Searches generally are permitted in any area where the items in question could possibly be contained. *United States v. Edwards,* 343 Fed. App'x. 468, 471 (11th Cir. 2009). Where law enforcement officers are legally permitted to conduct a search, they can break open furniture or objects to search its contents. *United States v. Martinez*, 949 F.2d 1117, 1120 (11th Cir. 1992) ("a warrant to search a specific area for a certain class of things authorizes government agents to break open locked containers which may contain the

---

[6] For the Record, the Court notes that the Government contends one firearm was found in Defendant's desk drawer prior to opening the gun safe. During the Court's hearing on October 22, Defendant, by and through counsel, states that if a gun was found prior to search of the gun safe at Defendant's residence then Defendant would look to suppress all firearms with the exception of that gun found outside the gun safe.

objects of the search.") (*citing United States v. Gonzalez*, 940 F.2d 1413, 1420 (11th Cir.1991); *United States v. Morris*, 647 F.2d 568, 572-73 (5th Cir. 1981)).  According to Agent Luke's testimony and as noted in the Government's briefing, there was a belief that controlled substances could be located in the gun safe considering its size.

The Court's suppression of statements to Agent Reed, including Defendant's disclosure of the gun safe's passcode, are of little import in assessing the permissibility of the search for items seized within the gun safe because discovery of the firearms was inevitable.  Seizure of items that would be inevitably discovered lawfully are permissible if obtained after an illegal interrogation when the Government proves lawful means were pursued to gather the evidence prior to the initiation of illegal conduct.  *Nix v. Williams*, 467 U.S. 431, 449-50 (1984); *United States v. Stilling*, 346 Fed. App'x 458, 459 (11th Cir. 2009)("Under the inevitable discovery exception to the exclusionary rule, 'there must be a reasonable probability that the evidence in question would have been discovered by lawful means, and the prosecution must demonstrate that lawful means which made discovery inevitable were being actively pursued prior to the occurrence of the illegal conduct.'")(*quoting Jefferson v. Fountain*, 382 F.3d 1286, 1296 (11th Cir. 2004)).  In the view of the Court, based on law enforcement's reasonable suspicion Defendant was participating in illegal activities, the terms of Defendant's probation, and prior seizure of a marijuana plant, it was reasonable to search a gun safe big enough to contain additional illegal substances.  During the initial search of Defendant's residence, per the terms of Defendant's probation and reasonable suspicion, the officers were authorized to open containers like the gun safe.  Discovery of the firearms inevitably seized were permissible on that basis alone and without regard to the passcode for the safe.  As a result, regardless of Defendant's recitation of the gun safe's passcode, entry into the gun safe and the eventual seizure of the firearms therein is justifiable upon the existing reasonable suspicion and not upon Defendant's provision of the code to the gun safe.  At worst, Defendant benefitted by not having his property damaged.

Along with the Government's reliance on reasonable suspicion and Defendant's probation terms, the Government asserts discovery of firearms within the gun safe is permitted by the plain view doctrine.  *See United States v. Folk*, 754 F.3d. 905, 911 (11th Cir. 2014) ("Under the plain view doctrine, the warrantless seizure of an item is permissible

where '(1) an officer is lawfully located in the place from which the seized object could be plainly viewed and must have a lawful right of access to the object itself; and (2) the incriminating character of the item is immediately apparent'") (*quoting United States v. Smith*, 459 F.3d 1276, 1290 (11th Cir. 2006)). That the firearms were readily visible (in plain view) once the gun safe was opened is not doubtful. However, the Court finds that the legality of the officers' search, given the stated facts, is not dependent upon plain view doctrine alone. As found by the Court, officers established adequate reasonable suspicion that Defendant, a probationer whose person and residence was subject to search per the terms of his probation, was engaging in illegal conduct (i.e.—possession of marijuana, a controlled substance).[7] That being the case, the officers were justified and entitled to search the premises for controlled substances, including closed or enclosed space where controlled substances could be stored. The gun safe was such a place. Unfortunate for Defendant, the safe also contained firearms.

Therefore, for aforementioned reasons stated, Agent Reed's seizure of twelve firearms found in the gun safe on Defendant's premises are not suppressed.

## CONCLUSION

For the foregoing reasons, Defendant Motion is **GRANTED-in-PART** as it pertains to suppression of custodial statements made after Agent Luke's "off the record" statement and **DENIED-in-PART** as it pertains to physical evidence seized by law enforcement. (Doc. 23.)

**SO ORDERED**, this __16th__ day of December, 2014.

/s/ W. Louis Sands
**W. LOUIS SANDS, JUDGE**
**UNITED STATES DISTRICT COURT**

---

[7] Although the Government predominately relies on the plain view doctrine in establishing lawful seizure of firearms within the gun safe the Court notes that "'when an issue or claim is properly before the court, the court is not limited to the particular legal theories advanced by the parties, but rather retains the independent power to identify and apply the proper construction of governing law.'" *United States Nat. Bank of Ore. v. Independence Ins. Agents of America, Inc.*, 508 U.S. 439, 446 (1993) (*quoting Kamen v. Kemper Financial Services, Inc.*, 500 U.S. 90, 99 (1991)).